[Crim. No. 15724. Second Dist., Div. Five. Dec. 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WAYNE RODERICK MOORE et al., Defendants and Appellants.

[Crim. No. 15723. Second Dist., Div. Five. Dec. 10, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ALVIN DANIEL CREWS, Defendant and Appellant.

(Consolidated Appeals.)

## COUNSEL

Roger S. Hanson and Nicholas St. John, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James L. Markman, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**AISO, J.**—These two separate appeals are consolidated in this court for the purpose of this decision.

The charges against all appellants result from a burglary-robbery in Santa Barbara on February 2, 1968. The victims were one William E. Johnson and his wife Pearl. The evidence supportive of the convictions for the several crimes need not be detailed at this point. It was sufficient to prove that defendants Moore, Blackburn and Crews forced entry into the Johnson home during their absence, and, upon their return, at gun point, robbed the victims of a 12 to 13 thousand-item coin collection, three watches, a pocket knife, sundry jewelry and currency. Before leaving, they forced Johnson to give them the key to his car which they used for the getaway. The car was discovered early the next morning on a parking lot 1½ to 2 miles from the Johnson home and only a block or so from an on-ramp to the freeway to Los Angeles. The Johnsons were left bound and gagged. Their dog had been doped.

Moore and Blackburn were arrested in Los Angeles on February 13, 1968, for burglary. The arresting officers were Sergeant William Lee and his superior, Lieutenant M. P. King, of the Los Angeles Police Department. They were assisted by a number of other fellow officers participating in a "stakeout." At the time of this arrest, Sergeant Lee was unaware of the crimes which had been committed in Santa Barbara a few days earlier; however, the arrest of Moore and Blackburn led to a great deal of physical

evidence which linked them to the Santa Barbara offenses. It also provided physical evidence of their association with Crews. Crews, in turn, was arrested in La Crescenta, California, on March 14, 1968. His arrest also led to the discovery of physical evidence probative of his participation in the Johnson robbery.

The Santa Barbara County Grand Jury indicted Moore and Blackburn on February 28, 1968. They pleaded not guilty and moved to suppress the evidence seized at the time of their arrest. (Pen. Code, § 1538.5) The motion was heard and denied on April 1, 1968.

Crews was indicted on April 25, 1968. He, also, pleaded not guilty and moved to suppress the evidence seized contemporaneously with his arrest. At that motion Crews merely attacked the illegality of his own arrest, which was based on probable cause to believe that he had committed an entirely different robbery on March 12, 1968, in the Los Angeles area. The motion was denied on May 20, 1968.[1]

Eventually, both matters were consolidated for trial which commenced on June 25, 1968. A jury found all defendants guilty on several counts. On July 12, 1968, the court pronounced judgment against Moore and Blackburn on count I (Pen. Code, § 459—burglary), count II (Pen. Code, § 211—robbery, first degree) and count V (Veh. Code, § 10851—automobile theft). On July 22 judgment was pronounced against Crews on the same counts. In addition the court pronounced judgment against Crews on counts III and IV (Pen. Code, § 209, kidnaping for the purpose of robbery), counts of which Moore and Blackburn had been found not guilty. All were sentenced to state prison.[2] They appeal from the respective judgments.

### The Moore-Blackburn Appeal

Moore and Blackburn, who are jointly represented on this appeal, contend: (1) their arrests and the accompanying search were illegal; (2) the delay in their arraignment before a magistrate constituted prejudicial error; and (3) the evidence was insufficient to prove their participation in the

---

[1]Crews has never claimed that the Moore and Blackburn arrests were illegal and that any physical evidence seized in connection therewith should be suppressed as to him.

[2]As to Moore and Blackburn, the court stayed execution of sentences on counts I and V "until the completion" of sentence on count II. (Pen. Code, § 654; *In re Wright* (1967) 65 Cal.2d 650, 655-656, fn. 4 [56 Cal.Rptr. 110, 422 P.2d 998].) As to Crews, the court stayed executions on counts I, II and V until completion of concurrent sentences on counts III and IV (kidnaping for robbery, Pen. Code, § 209).

crimes for which they were convicted. The only contention which requires extended discussion is the first.

The only witness called by the People to sustain the warrantless arrest of Moore and Blackburn was Sergeant Lee, an 18-year veteran with the Los Angeles Police Department, who had been investigating Blackburn and Moore under the supervision of Lieutenant King. Prior to his arresting Moore and Blackburn, Lee was "aware of" recent coin and jewel thefts in the southern California area. Different "groups" were suspected.

One gang under suspicion for jewelry thefts was known as the "Treadway group." It was Lee's "information" that Blackburn was involved in an investigation of a jewelry theft of which that group was suspected. It was "assumed" that he was a member of the group and an associate of Moore.

Another group was known to the police as the "Miami group." Among those "belonging to" that group were Bobby Gene Staples (or Bobby Lee Staples), aka Jimmy Waters, Edward Vernon DeCoursey, DeCoursey's brother, Leo Spencer Parker, Allen Dale Keuhn, and Robert Lawrence Greenwood. Its best known member was Roland Murphy, known popularly as "Murph the Surf" who, together with Allen Dale Keuhn, had previously been convicted and served sentence for stealing the DeLong ruby and a large star sapphire from the Metropolitan Museum in New York.[3] Sergeant Lee "knew" that the members of the Miami group were in possession of stolen jewelry, that they had "carried burglarists [sic] instruments with them and were armed." On previous occasions when they had been arrested by members of Sergeant's Lee's squad, they had vehicles "which could be termed to be in their possession illegally."

According to Lee's "information," Moore had an "extensive burglary" or breaking and entering background. Lee had a "good idea" that "they" were from Carolina.

The prosecution connected Blackburn to the Miami group as well, to a degree, by evidence that Lee had observed Edward DeCoursey driving a 1968 Cadillac registered to one Patsy Turner at a certain address in Greensboro, North Carolina.[4] Lee had "information" that Blackburn had pur-

---

[3]Lee testified that he had previously arrested Staples together with Murphy and Keuhn. There is no evidence, however, that the arrest of Staples had anything to do with the New York crime, that Staples was ever convicted of the offense for which he had been arrested, or, for that matter, that when Lee made the arrest, it was on probable cause for any specific crime.

[4]Blackburn's trial counsel objected to the witness' statement that he "knew" "defendants . . . were . . . connected . . . with the other members of the group, namely, Edward Vernon DeCoursey and Bobby Gene Staples, also known to me as Jimmy Waters" on grounds that it "would be a conclusion of the witness unless he says he has information to that effect." The court ruled: "The objection is sustained and

chased the car for *Mr. Turner*.[5] Lee had seen Blackburn drive the same car and had "information" that he had a girlfriend whose name he would sometimes use. At the time of the arrest the Cadillac was in the parking area at 5119 Fountain Avenue, an apartment house where Moore and Blackburn lived.

Moore's vehicle, to the best of Lee's knowledge, was a 1963 Lincoln Continental. He had seen Moore in that vehicle together with Staples. On February 12 Lee had also seen Moore and Staples together in the garage area at 5119 Fountain.[6]

Lee had information that Moore and Blackburn were in possession of stolen coins. Asked on cross-examination from whom he received the information, he replied that he had received it from Lieutenant King a couple of days prior to the arrest. Lee was not asked in what form this information was imparted to him, or as to whether he knew of King's source of this information. King was not called as a witness.

On February 13, Lee, King, and several other officers were conducting a "stakeout" of the apartment at 5119 Fountain Avenue, when, at about 3:30 a.m., Moore drove up in an automobile and parked it in the driveway of the apartment building, although the parking area for cars was in the rear of the building. Moore alighted from the vehicle and looked around apprehensively for "quite some period of time." He opened the trunk of the car and with both hands removed a leatherette or plastic suitcase, about 1½ feet long, 16 inches high, and 8 inches wide, and placed it on the driveway. From Moore's apparent exertion in lifting it (requiring use of both hands) and from the thud it made when he put it down, Lee concluded that it was very heavy. Based upon the information which he had concerning Moore and from the apparent heaviness of the suitcase, Lee felt

---

the answer in that form is stricken. It would be conclusionary. He can state what information he had." Whether this caused the witness to testify in the form of having information cannot be ascertained; it is a factor to be considered when defendants now object that the source of some of the information was not testified to.

[5] The reason for this switch from apparently a female name "Patsy Turner" to Mr. Turner was not clarified in the 1538.5 hearing. Lee testified at the trial proper that the names of Turner and Moore were on the mailbox, that he found repair bills for the Cadillac made out to "Pat Turner" at Crews' address, and that Blackburn told Lee that he used the names of Turner and Swain. Whether this was known to Lee prior to his entry into the premises of 5119 Fountain Avenue is not clear. His testimony at the 1538.5 hearing that he ascertained that Blackburn was living with Moore from the fact that prior to the arrest he knew that "[t]heir names were both on the mailbox at this location" carries some inference that he knew Turner was Blackburn.

[6] The transcript contains, in different places, two mentions of meetings between Moore and Staples. It is not certain whether Lee was not, in fact, talking about one and the same meeting.

that the suitcase contained loot from a burglary, or burglar's tools, "some type of contraband." He then formed the intention to arrest Moore.

Moore then carried the suitcase into an apartment, closing the door behind him. Lee and King followed Moore to the apartment and, when admitted, they arrested Moore and Blackburn for burglary. As noted, it was as a result of that arrest that the officers discovered evidence which connected all three defendants to the Santa Barbara robbery.

Counsel vigorously attacks the validity of the arrest. There are two main thrusts to his argument: First, he contends that the totality of the information of which Sergeant Lee thought himself possessed at the time of the arrest did not add up to probable cause to believe that Moore had committed a felony. Second, he claims that the prosecution did not comply with what has become known as the "two-pronged test" of *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], as explained in *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584] and applied in several cases decided by our own Supreme Court. (E.g., *People* v. *Hamilton* (1969) 71 Cal.2d 176, 179-182 [77 Cal.Rptr. 785, 454 P.2d 681]; *People* v. *Scoma* (1969) 71 Cal.2d 332, 336-340 [78 Cal.Rptr. 491, 455 P.2d 419]; *People* v. *Benjamin* (1969) 71 Cal.2d 296, 301-303 [78 Cal.Rptr. 510, 455 P.2d 438]; cf. *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485].)

We turn first to a consideration of the questions raised by defendant's contention that the requirements of the *Aguilar-Spinelli* and the *Harvey-Madden*[7] lines of cases were not observed. ■ The burden of proving justification (probable cause) in a warrantless arrest is, of course, on the People. (*People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921]; *People* v. *Faris* (1965) 63 Cal.2d 541, 545 [47 Cal.Rptr. 370, 407 P.2d 282]; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) The *Aguilar-Spinelli* line requires that in case of warrants, the affiant deposing that he has information must further state underlying facts: the reliability of the informant, what the informant actually said, and the basis of the informant's knowledge or information. The line of cases running from *People* v. *Harvey* (1958) 156 Cal.App.2d 516, 523-524 [319 P.2d 689] to *People* v. *Madden* (1970) 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971] holds that where a police officer seeks to justify a warrantless arrest upon information relayed to him from another police officer, the officer initiating the relay must be called to prove that his information was reliable. In applying these rules, it has been stated that " 'the requirements of reliability and particularity of the information on which an officer may act . . . where an arrest warrant is absent . . . cannot be

---

[7] *People* v. *Harvey* and *People* v. *Madden* cited below.

less stringent than where an arrest warrant is obtained . . .' *Wong Sun* v. *United States,* 371 U.S. 471, 479-480 . . ." (*Beck* v. *Ohio* (1964) 379 U.S. 89, 96 [13 L.Ed.2d 142, 147, 85 S.Ct. 223, 228]), or that "a greater showing of probable cause is required to justify an arrest without a warrant than to justify a search pursuant to a warrant" (*People* v. *Madden, supra,* 2 Cal.3d 1017, 1023).

Before applying these rules, however, we note that if the first judicial consideration of the justification for the arrest occurs in an adversary hearing (e.g., a Pen. Code, § 1538.5 hearing) as contrasted to an ex-parte issuance of a warrant, numerous procedural rules applicable to our adversary theory of judicial proceedings must first be considered. ■ "If it is believed that probable cause for a search has not been shown an objection is called for in order to afford the People an opportunity to remedy the deficiency, if any" (*People* v. *Gonzales* (1961) 193 Cal.App.2d 434, 436 [14 Cal.Rptr. 66]); and the specific ground for the objection should be pointed out (*People* v. *Drumgo* (1969) 269 Cal.App.2d 479, 482 [74 Cal.Rptr. 761]) so that the trial court may rule upon the precise issue. ■ "The initiative in excluding improper evidence is left entirely to the opponent,—so far at least as concerns his right to appeal on that ground to another tribunal." (1 Wigmore on Evidence (3d ed. 1940) § 18, p. 321.) Evidence Code section 353 reads in part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion. . . ." (See also *People* v. *DeSantiago* (1969) 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353].) The rationale of these rules has been explicated by our former Chief Justice Traynor [then Justice] in *Coy* v. *Superior Court* (1959) 51 Cal.2d 471, 473 [334 P.2d 569], and need not be reiterated here.

■ In an adversary hearing, the defense has an opportunity to examine the witness by way of *voir dire* examination or by cross-examination to show that information which appears to be fresh, factual, credible and personal is actually conclusional, untrustworthy, or based on rumor only. With this opportunity comes a correlative duty to point out these weaknesses to the trial court by a demand for further particulars or by cross-examination if the particular defect is to be raised on appeal. In *People* v. *Talley* (1967) 65 Cal.2d 830, 837 [56 Cal.Rptr. 492, 423 P.2d 564], our Supreme Court stated: ". . . [W]here . . . the initial determination of probable cause is made in an adversary proceeding it may be that it is incumbent on the defense to demand further particulars with respect to the informer's information (see 53 Cal.L.Rev. 840, 845-846), and here this was not done." In

*United States* v. *Briones* (5th Cir. 1970) 423 F.2d 742, 744, cert. denied, 399 U.S. 933 [26 L.Ed.2d 804, 90 S.Ct. 2270], the court, concluding that a prima facie case of probable cause had been made out, stated: "[I]f Briones wished to contest the reliability of the informer or the independent knowledge of the agents, he should have cross-examined them below to bring out deficiencies in the justification."

As for the necessity of preserving a *Harvey-Madden* issue by an objection directed to that specific ground in the trial court, we held in *People* v. *Escollias* (1968) 264 Cal.App.2d 16, 19 [70 Cal.Rptr. 65], that absent such a specific objection the issue could not be raised on appeal.[8]

A great deal of Sergeant Lee's testimony might have been reduced to insignificance by appropriate objections, *voir dire* examination, cross-examination, motions to strike, or specification of reliance on the *Aguilar-Spinelli* or the *Harvey-Madden* rules. But nothing of this kind was attempted. In fact, it may well be that the officer testified in terms of "having information" rather than "having personal knowledge" or that "he knew" because of Blackburn's trial counsel insisting on that form early in Lee's direct examination. On the other hand, we cannot rule out the possibility that if appropriate objections had been made the People would have called other witnesses (including Lieutenant King) or produced certified copies of official records. ■ It may well be that defense counsel chose to leave the matter in a penumbral shading knowing that a stronger case could have been made out against the defendants if the specific issue had been raised. Under these circumstances, the objections based on *Aguilar-Spinelli* or *Harvey-Madden* rules may not be raised for the first time on appeal. In *People* v. *Madden, supra,* 2 Cal.3d 1017, the trial court (according to the reporter's transcript)

---

[8]This was an application of the general rule that where the objection is lack of proper foundation, counsel must point out specifically in what respect the foundation is deficient. (See, e.g., *People* v. *Owens* (1899) 123 Cal. 482, 490 [56 P. 251]; *People* v. *Hart* (1908) 153 Cal. 261, 265-266 [94 P. 1042]; *People* v. *Modell* (1956) 143 Cal.App.2d 724, 730-731 [300 P.2d 204].)

For instances where a Fourth Amendment problem was held barred from consideration, because of failure to point out the defect in the trial court, see, e.g.,: *Coy* v. *Superior Court, supra,* 51 Cal.2d 471, 473, failure to disclose identity of informant; *People* v. *Ditson* (1962) 57 Cal.2d 415, 442 [20 Cal.Rptr. 165, 369 P.2d 714], objection to a confession does not cover objection that "head and arms" of a murder victim constituted "fruit of a poisoned tree"; *People* v. *DeSantiago, supra,* 71 Cal.2d 18, 22-23, general no probable cause objection does not cover violation of Penal Code section 844; *People* v. *Fischer* (1957) 49 Cal.2d 442, 446, objection on ground of hearsay does not reach reliability of information.

Specification of one ground for a claimed illegal arrest in the trial court does not permit defendant to raise a different ground on appeal. (*People* v. *Talley, supra,* 65 Cal.2d 830, 837-838; *Guevara* v. *Superior Court* (1970) 7 Cal.App.3d 531, 533-534 [86 Cal.Rptr. 657]; *People* v. *Wolder* (1970) 4 Cal.App.3d 984, 995 [84 Cal.Rptr. 788]; *People* v. *Fritz* (1967) 253 Cal.App.2d 7, 14 [61 Cal.Rptr. 247].)

raised the issue on its own motion and appears to have given consideration to it, although defense counsel appears to have reached it only obliquely.[9]

Moore argued in the trial court that he was arrested solely because of his associations and this argument is repeated on appeal, counsel relying on cases such as *People* v. *Privett* (1961) 55 Cal.2d 698 [12 Cal.Rptr. 874, 361 P.2d 602]; *People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]; and *People* v. *Shelton* (1964) 60 Cal.2d 740, 745 [36 Cal.Rptr. 433, 388 P.2d 665]. We think that our statement of facts demonstrates that far more than mere association was shown here. ■ Conceding for the sake of argument that Lee's knowledge of the criminal background and associations of Moore and Blackburn would have been insufficient to arrest them, it was valuable corroboration of the information gathered from Lieutenant King and Lee's own personal observations and therefore properly considered on the probable cause issue. (*People* v. *Garcia* (1960) 187 Cal.App.2d 93, 100 [9 Cal.Rptr. 493].)

It is also argued that the arrest was illegal because Lee was not aware of any particular felony which Moore had committed. This circumstance is hardly determinative. If a known professional burglar walks down the street furtively carrying a small safe with physical indications that it has lately been ripped out of a wall, no one would deny a peace officer's right to make an arrest although he has no information concerning the particular burglary which produced the safe.

Moore and Blackburn argue that Moore, his associations aside, was arrested for exercising his "God-given right" to arrive at his home, late at night, carrying a heavy suitcase. That, of course, is a fallacy; we don't know of a "God-given right" to come home carrying stolen property. ■ While furtive movements in and of themselves may not constitute probable cause, nevertheless, furtive and suspicious movements do constitute an important recognizable factor in establishing probable cause. (See, e.g., *People* v. *Blodgett* (1956) 46 Cal.2d 114, 117 [293 P.2d 57]; *People* v. *Collom* (1968) 268 Cal.App.2d 242, 247 [73 Cal.Rptr. 707].) Acts which may appear innocent to an uninformed bystander nevertheless can take on a sinister significance when viewed in the light of information leading one to believe that the acts are in furtherance of a criminal enterprise.[10]

■ Returning to the general objection that the overall evidence fails to establish probable cause, we conclude that the evidence is sufficient to establish a minimum but adequate justification for the arrest. ■ Evidence

---

[9]For example of a case wherein the issue is specifically raised, see *Ojeda* v. *Superior Court* (1970) 12 Cal.App.3d 909 [91 Cal.Rptr. 145].

[10]Cf. the rule that an overt act required to establish a criminal conspiracy need not be criminal *per se*.

which may be technically incompetent can sustain a finding if admitted without objection. (See Witkin, Cal. Evidence (2d ed. 1966) pp. 1207-1209.)

"Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. . . . Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but *leaves some room for doubt.*" (Italics added.) (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577], cert. denied, 364 U.S. 841 [5 L.Ed.2d 65, 81 S.Ct. 79].) "In dealing with probable cause, . . . *we deal with probabilities.* These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, *not legal technicians, act.*" (Italics added.) (*Brinegar* v. *United States* (1949) 338 U.S. 160, 175 [93 L.Ed. 1879, 1890, 69 S.Ct. 1302, 1310].) In *Spinelli* v. *United States, supra,* 393 U.S. 410, 419 [21 L.Ed.2d 637, 645, 89 S.Ct. 584, 590], the court stated: "In holding as we have done, we do not retreat from the established propositions that only the probability, and *not a prima facie showing,* of criminal activity is the standard of probable cause. . . ." (Italics added.) The totality of circumstances brought out in this case—the extensive background of criminal activities and associations concerning the defendants known to Lee, the information from his superior, King, that defendants were in possession of stolen coins, the furtive and suspicious conduct of Moore while opening the trunk of his car at 3:30 a.m. in the morning and leaving the car in the driveway, the apparent heaviness of the contents of a small carrying case, and the inferences deducible therefrom—was sufficient to permit a reasonably prudent person to entertain a strong suspicion that Moore was coming from a burglary or was transporting stolen property in violation of Penal Code section 496 (concealing, withholding, or aiding in the concealing or withholding of stolen property).

The second point made by Moore and Blackburn is that their arraignment in the municipal court after their arrest was illegally delayed in violation of article 1, section 8, of the California Constitution and section 825 of the Penal Code. They ask us to augment the record on appeal with the municipal court records which, we are assured, show that while that arrest took place on February 13, there was no arraignment in Santa Barbara until February 16.

We take counsel's word for what the record would show and will treat our record as augmented. The Attorney General gives us various reasons why the point made by Moore and Blackburn nevertheless lacks merit on this appeal. Without suggesting that his other reasons are not equally

cogent, we agree that the present case is on all fours with *People* v. *Wein* (1958) 50 Cal.2d 383, 411 [326 P.2d 457], cert. denied, 358 U.S. 866 [3 L.Ed.2d 99, 79 S.Ct. 98], (overruled on other grounds, *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1130 [80 Cal.Rptr. 897, 459 P.2d 225]) where the court said: ". . . Further, it would serve no useful purpose to add the requested document to the record since defendant cannot claim for the first time on appeal, as he attempts here, that he was not seasonably brought before a magistrate. (*People* v. *Newell,* 192 Cal. 659, 669 [221 P. 622]; *People* v. *Tennyson,* 127 Cal.App.2d 243, 246 [273 P.2d 593].) . . ."

■ Finally Moore and Blackburn claim that the evidence shows, at most, that they were guilty of receiving stolen property. This argument is based primarily on the fact that the only burglar identified by the victims was Crews. There was, however, strong circumstantial evidence that Crews' two companions were Moore and Blackburn: testimony that before the burglary all three said they were going to Santa Barbara on business, that after the burglary they made a list from packets containing coins, that a map of Santa Barbara, a book listing coin collectors and their addresses, documents linking Moore and Blackburn to Crews, a telephone book with the victims' name and address singled out, plus equipment which could have been used to dope a dog were found in the apartment, that a footprint in the Johnson yard was connected to Blackburn's shoes and, finally, that a screwdriver similar to one which made marks on the door frame at the Johnson residence was found in Blackburn's car.

## CREWS' APPEAL

■ Crews contends that the prosecution improperly used a 1957 federal conviction to impeach him because it was only a misdemeanor conviction and because it was obtained without the aid of effective counsel. He also claims that the victims' identifications at the trial were tainted by a pretrial review of photographs.

The felony in question was a violation under 18 U.S.C.A. section 2115 (post office burglary), punishable by a fine of not more than $1,000 or imprisonment for not more than five years, or both. Crews was sentenced to prison for three years. Under federal law the conviction was a felony, regardless of the punishment imposed. It was, therefore, a felony for purposes of impeachment (*People* v. *Washington* (1967) 248 Cal.App.2d 470, 477 [57 Cal.Rptr. 487]; *People* v. *Theodore* (1953) 121 Cal.App.2d 17, 29 [262 P.2d 630]) quite apart from the fact that three years in prison would also have made it a felony under California law.

■ Procedurally, the claim of ineffective representation at the federal trial was properly raised. (*People* v. *Coffey* (1967) 67 Cal.2d 204, 217-

218 [60 Cal.Rptr. 457, 430 P.2d 15].) At a hearing outside the presence of the jury Crews testified as follows: after a first trial had resulted in a deadlocked jury, he reported to the courthouse on the date set for retrial. He then learned for the first time that the attorney who had represented him at the first trial had died. His case was consolidated with that of another person, and the attorney who represented the codefendant was instructed to represent both accuseds. Trial started that day. Crews denied guilt at the trial, while his codefendant's defense was based on insanity. While the appointed counsel "did the best he could with what he had," his primary interest was the codefendant, who was acquitted. The attorney cross-examined the witnesses against Crews "to the extent that he could because the testimony of his [sic] witnesses the way he had to ask the questions—you understand that I had no defense after that, none." After this testimony was given, defense counsel argued that if the record of the 1957 trial were available "it might very well show that there was [a] conflict of interest." The prosecution took the position that it was not the law that prior felonies could not be used to impeach simply because of a showing of lack of adequate representation. Defense counsel agreed on that point[11] and also stated that "we really cannot resolve the question as to whether or not there was a conflict here." The court eventually ruled against the defendant who then admitted the prior which had been charged against him in the indictment. He later testified before the jury, and the 1957 felony was used to impeach him.

On so vague a record we cannot hold that Crews carried the burden of proof on the issue of the validity of the prior conviction. (Cf. *In re Caffey* (1968) 68 Cal.2d 762, 772 [69 Cal.Rptr. 93, 441 P.2d 933].) If for no other reason, the ruling must be upheld on the basis that the court was free to disbelieve the testimony of an obviously interested witness or, more mildly perhaps, that the court was free to believe that the lay witness whose testimony actually amounted to nothing more than a bald conclusion that he had been ineffectively represented at the first trial, did not assess the situation correctly.

 Lastly it is claimed that the record indicates that the police "stacked the deck" against Crews when showing photographs to the two victims after the crime. It is not claimed, nor was it claimed below, that Crews was entitled to the assistance of counsel when his photograph was shown to the victims.

The record shows no unfairness of any kind. Apparently the victims were shown photographs of possible suspects both before and after Crews' arrest, and it was after the arrest that they were given a picture of Crews to look at. It was one of a group. Both Johnsons made tentative identifications at the

[11]We express no view on the question.

time and positive identifications at the trial. There is no evidence of any overt or covert suggestions that Crews' picture was the one either victim was supposed to identify. The point has no merit.

 Because of the intervening decision of *People* v. *Daniels, supra,* 71 Cal.2d 1119, 1126-1140, the judgment must be reversed with respect to Crews' conviction for kidnaping for the purpose of robbery, that is to say counts III and IV. (Pen. Code, § 209.)[12]

Another recent case, *People* v. *Bauer* (1969) 1 Cal.3d 368, 375-378 [82 Cal.Rptr. 357, 461 P.2d 637], makes it clear that defendants should not have been sentenced on count V (Veh. Code, § 10851—automobile theft), even if, as the trial court apparently found, stealing the Johnson car was an afterthought.

Therefore, the judgment against Crews on counts III and IV (Pen. Code, § 209) is reversed; the judgment on count V (Veh. Code, § 10851) is reversed insofar as it imposes a sentence thereon; and the case is remanded to the trial court for reimposition of sentences on counts I (Pen. Code, § 459) and II (Pen. Code, § 211) to comply with Penal Code section 654, because of reversals on counts III, IV and V. The judgments against Moore and Blackburn as to count V (Veh. Code, § 10851) are reversed insofar as they impose a sentence thereon; and in all other respects the judgments against Moore and Blackburn are affirmed.

Stephens, Acting P. J., and Reppy, J., concurred.

The petition of appellants Moore and Blackburn for a hearing by the Supreme Court was denied February 3, 1971.

---

[12]The maximum distance that either victim was moved was about 32 feet, all inside their home.