[Crim. No. 20978. Second Dist., Div. Five. Oct. 5, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM JOHN COLEMAN, Defendant and Appellant.

[Crim. No. 20979. Second Dist., Div. Five. Oct. 5, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JO ANN MAHER, Defendant and Appellant.

(Consolidated Cases.)

38

## COUNSEL

Clifford Douglas and Richard H. Levin, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert L. Ashby and Edward A. Hinz, Jr., Chief Assistant Attorneys General, William E. James, Assistant Attorney General, S. Clark Moore and Norman H. Sokolow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—An information filed by the District Attorney of Los Angeles County charged defendants in count I with a violation of section 11911 of the Health and Safety Code (possession for sale of a restricted dangerous drug, amphetamine or "speed"). Count II charged them with a violation of section 11530.5 of the Health and Safety Code (possession for sale of a narcotic, marijuana).

Defendants pleaded not guilty. Their motions under sections 995 and

1538.5 of the Penal Code were denied. They were tried by a jury and found guilty. A new trial and probation were denied.

## FACTS

An outline of the facts will suffice at this point. It will be fleshed out as the occasion demands.

On March 20, 1970, Officers Wanek and Moore surveilled a home at 12317 Osborne Place, having received certain information with respect to narcotics activities there. When four persons, two men and two women, emerged from the house and left in a car, the officers followed. In due course all four were arrested and at least three, including Jeffery Skorman, the driver, were found to be in possession of speed. Suitably induced, Skorman then cooperated with Wanek in obtaining a search warrant for the home on Osborne by signing an affidavit that he obtained his speed there.[1] The warrant was executed several hours after the Skorman arrest. The execution produced the contraband which was the basis for the defendants' convictions.

While Wanek was busy obtaining the search warrant, Moore had returned to the Osborne address which he entered—perhaps legally, perhaps not. He arrested the defendant Maher when she arrived with groceries. According to the People's proof, neither Moore's entry nor the arrest yielded any contraband.

Coleman was not arrested until several weeks later.

## DISCUSSION

### I.

On appeal defendants naturally challenge the validity of the search warrant.

The key issue is clearly the legality of Skorman's arrest. If defendants have standing to raise the issue[2] and if the People do not succeed on it, it would be next to impossible to uphold the validity of the search warrant which was secured only because of Skorman's willingness to cooperate. It is obvious from all of the circumstances and Skorman's changed attitude at the

---

[1]Wanek, with Skorman in tow, found the issuing magistrate at a charity party that was being given in the public rooms of a brewery.

[2]This question was expressly left open in *Theodor* v. *Superior Court*, 8 Cal.3d 77, 105 [104 Cal.Rptr. 226, 501 P.2d 234] decided by the Supreme Court on September 28, 1972.

trial (see fn. 8, *infra*), that what induced him to sign the affidavit was the promise of certain favors in connection with his own anticipated prosecution, rather than a desire to make a contribution to the fight against drugs.

Although the question is extremely close and factually similar precedent has not been brought to our attention (cf. *People* v. *Gonzales,* 17 Cal. App.3d 848 [95 Cal.Rptr. 291]), we have concluded that on the record we have we cannot say that the arrest was illegal as a matter of law. As will be seen, this rather guarded way of expressing our holding is not accidental.

At the 1538.5 hearing Wanek testified at one point that he had the Osborne home under surveillance because he had "received information from another police officer and from several informants, both reliable and also untested" that defendants Maher and Coleman were living at 12137 Osborne and that speed, other narcotics and dangerous drugs were being sold from there. He had previously arrested Maher on drug charges. His testimony was not challenged on legal grounds.

At another point, again without challenge, Wanek testified that he had received information from a sergeant in the burglary division that defendants were receiving stolen property and dealing in marijuana and dangerous drugs. One Murray and one Fleming, described by Wanek as reliable confidential informants, had told him that defendants were dealing in speed and marijuana. Fleming had said that he had bought a kilo of marijuana at the house "several nights before . . . and had it lidded up in the house and it was hidden in the garage area and that [defendants] also had some lids in the house for sale."

At yet another point, in answer to questions by the court, Wanek testified as follows: "THE COURT: Did you have other information respecting Jo Ann Maher before you went to the location? THE WITNESS: On Osborne Place? THE COURT: Yes. THE WITNESS: Yes. THE COURT: Did that come from various informants? THE WITNESS: Yes, two of which I have named today, and also I received information from Detective Sergeant Johnson from downtown Burglary that he had an informant who had just told him that he'd taken some stolen property and sold it at that address, and in fact Jo Ann Maher and Billy Coleman were dealing narcotics and receiving stolen property from that location, and he insinuated or, I believe, stated that his informant was an arrestee on a burglary charge who he felt was also a reliable informant."

In the absence of appropriate objections it is clear that the trial court could ascribe full evidentiary value to Wanek's testimony. (See generally

*People* v. *Moore,* 13 Cal.App.3d 424, 432-435 [91 Cal.Rptr. 538].) In legal effect, then, Wanek had information from reliable informants that the Osborne address was used for dealing in various drugs.

When Skorman and his three companions left the premises at about 1:30 p.m., Wanek recognized one of the two women, Diane Chevalier, whom he knew to be a user of speed and a close personal friend of defendant Maher. He and Moore followed the car, which was being driven by Skorman. It proceeded to a shopping center parking lot. Skorman went somewhere for 15 to 30 minutes. His male companion in the front seat, later identified as Peter Townsend, apparently stayed in the car. The two women in the back seat went to a liquor store, bought a soft drink and then came back. After Skorman returned, Wanek approached the car to question Diane Chevalier. As soon as it appeared that Wanek wanted to talk about narcotics, both Miss Chevalier and the other lady—later identified as a Miss Wright—started to shed amphetamine and other contraband from their persons. Miss Chevalier was arrested as, presumably, was Miss Wright. Wanek's account then continues: "At this time I frisked Mr. Skorman. He had contraband on his person. I forget what Mr. Townsend had, I believe he had a hype kit. Everybody in that vehicle either possessed narcotic paraphernalia or some type of dangerous drugs. They were all placed under arrest for the subsequent charges."[3]

■ Of course, it was the People's burden to establish the legality of the warrantless arrest. (*Badillo* v. *Superior Court,* 46 Cal.2d 269, 272 [294 P.2d 24]; Evid. Code, § 664.) To uphold the implied finding of the trial court that the Skorman arrest was legal, we must therefore be able to point to affirmative evidence, direct or circumstantial, which justifies it.

Thus it will not do to base the legality of the arrest just on the discovery of contraband on Skorman's person: for absent probable cause to arrest when the frisk was started, no other justification therefor appears in the record, nor is it shown how a mere frisk led to the discovery of the contraband.[4]

---

[3]Wanek's account of the circumstances surrounding the arrest was not uncontradicted. We must, however, assume that the trial court resolved all conflicts in favor of its eventual ruling. (Evid. Code, § 402, subd. (c).)

[4]It may well be that the defense purposely left these areas unexplored. In his own affidavit in support of the search warrant Wanek claimed that the discovery of drugs on Skorman was the result of "a permissive search." The contents of this affidavit were apparently known to everyone in the courtroom at the 1538.5 hearing, though it was never formally offered in evidence. Nothing in Wanek's testimony negatives the possibility of a permissive search. Later, during the trial, Skorman was to claim that the speed was in an Excedrin tin which Wanek pulled out of Skorman's pocket. Again the possibility that he did so by permission is not negatived.

While the question is not free from doubt, we do believe that Wanek had probable cause to arrest Skorman at least as soon as his two female companions had proven themselves to be in possession of illegal drugs. While Wanek was still keeping the Osborne address under observation, he had a wealth of information concerning the goings on in that residence.[5] When four people emerged together from the house and two were found to be in personal possession of a drug which, according to his information, was being dispensed there, he was certainly confronted with "such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that" Skorman had also obtained drugs on the premises or, at least, that he had aided and abetted the two women in their obtaining of the contraband, and that he had unlawfully transported it. (Health & Saf. Code, § 11912.) Whether or not Wanek actually arrested Skorman before discovering contraband on his person is immaterial. The right to arrest justified the search. (*People* v. *Cockrell,* 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116].)[6]

Nor do we feel that the rule announced in *Agar* v. *Superior Court,* 21 Cal.App.3d 24, 28-29 [98 Cal.Rptr. 148], approved and applied by the Supreme Court in *People* v. *Miller,* 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228] and *People* v. *Superior Court (Simon)* 7 Cal.3d 186, 198, footnote 11 [101 Cal.Rptr. 837, 496 P.2d 1205], invalidates the *Skorman* arrest. In each of those cases the record demonstrated that the arresting officers did not believe that they had probable cause to make an arrest on grounds which would justify the particular search. Nothing of the kind is the case here. The most that can be said is that nobody asked Wanek just when he thought he had the right to arrest Skorman and what the probable cause for such an arrest was.[7]

---

[5]We do not stop to consider whether he knew enough to obtain a search warrant without the benefit of the information gathered as a result of the Skorman arrest. While Wanek's testimony at the 1538.5 hearing was quite detailed, his own affidavit in support of the search warrant was extremely sketchy concerning any information which brought him to the Osborne house in the first place. On appeal the People argue that his testimony at the 1538.5 hearing can be used to validate the search warrant without reference to the fruits of the Skorman arrest. This we cannot do. (See *Whitely* v. *Warden,* 401 U.S. 560, 565, fn. 8 [28 L.Ed.2d 306, 311, 91 S.Ct. 1031].)

[6]It is, of course, appreciated that what induced Skorman to cooperate with Wanek in obtaining the search warrant was not the arrest, but the seizure of the contraband found on his person. However, the record does not permit us to uphold that seizure except as an incident to a valid arrest—or the privilege to make one.

[7]This is quite understandable in view of the fact that at the outset of the 1538.5 hearing, when asked by the court for the grounds of the motion, neither defendant said anything about any claimed illegality of the Skorman arrest. Although early

## II.

■ Coleman claims that Moore's entry into the Osborne home while Wanek was busy obtaining the search warrant violated section 844 of the Penal Code.

There is a mass of conflicting evidence concerning the circumstances surrounding that entry. However, since the evidence adequately supports a finding that neither Moore's entry nor any arrest made before Wanek arrived with the search warrant, resulted in any evidence, the point is immaterial. (*People* v. *Valenti,* 49 Cal.2d 199, 203 [316 P.2d 633].)

## III.

Maher claims that the search warrant was issued on incompetent evidence. She attempts to classify Skorman as an "unreliable informer." Her problem is that in none of the cases she cites did the alleged unreliable informer sign an affidavit and appear before the magistrate. With respect to this particular issue, this case is clearly governed by *Skelton* v. *Superior Court,* 1 Cal.3d 144, 149-154 [81 Cal.Rptr. 613, 460 P.2d 485].

## IV.

■ Coleman argues that the court should have instructed the jury that Skorman was an accomplice and that his testimony had to be viewed with distrust (CALJIC No. 3.18) and needed corroboration (Pen. Code, § 1111; CALJIC No. 3.11).

Apart from the fact that Skorman's testimony was such that no one had to be told to distrust it,[8] it is apparent that he was not an accomplice

during Wanek's testimony there was an objection to evidence of Skorman's post-arrest statements "unless it can be shown that there was a lawful arrest," the claim that the search warrant itself was invalid because the Skorman arrest was illegal did not really become apparent until counsel for Maher made his argument after all the evidence on the motion to suppress had been heard. The only reason why we think that the issue is legitimately before us is that the prosecutor could then have asked for permission to reopen. He did not. The earlier objection during Wanek's testimony did not pinpoint the issue. Without any clear advice on where defendants were heading, the court may have legitimately decided that it wanted to hear what Skorman had said, reserving for later determination what legal effect should be given to his declaration if the arrest was illegal. Issues of attenuation or standing (*People* v. *Varnum,* 66 Cal.2d 808, 811-813 [59 Cal.Rptr. 108, 427 P.2d 772]) might arise. Counsel have no right to super-sophisticated rulings on evidentiary points unless they first advise the court just what is being tried.

[8]Skorman's desire to cooperate with the police had evaporated at the time of trial. He first refused to testify, claiming his privilege against self-incrimination. Granted immunity, his memory became selective. On any point important to the People, Skorman claimed that he had been under the influence of drugs when confronting the magistrate at the brewery. (See fn. 1, *supra.*) Nevertheless, whenever it seemed to

of defendants who were convicted of possession for sale and, moreover, were convicted on the basis of contraband other than that found in Skorman's possession. (See *People* v. *Chrisman,* 256 Cal.App.2d 425, 437 [64 Cal.Rptr. 733].)

## V.

█ Complaint is made that the court's instructions on the dominion element of possession were inadequate. The court gave CALJIC No. 12.00 which covers the point, even though the word "dominion" is not used. Nothing more specific was offered by the defense.

## VI.

█ Coleman makes the point—presently much in vogue—that the trial court should have given a *sua sponte* instruction embodying the principle of section 412 of the Evidence Code.[9] It is claimed that the prosecution's failure to offer evidence that defendants' fingerprints were on the contraband, should have triggered such an instruction.

There was no evidence that the prosecution had any fingerprint evidence. In fact, it tried to explain the absence of such evidence by an uncontradicted

---

help the defense, he had total recall, particularly with respect to details of that meeting.

For what Skorman's evidence is worth, he claimed that it was not only he who was under the influence of a drug, but also the magistrate who, having just taken a diet pill, could not read the documentation in support of the search warrant and who drank beer with him and Wanek, while Wanek "jokingly" told a story about an intoxicated officer who broke into an apartment and shot an innocent victim.

Needless to say this version of the "hearing" did not go unchallenged and we doubt that the court, the jury or anyone else who happened to be in the courtroom gave it much credence. The sad fact is that an occasion for evidence of this type had to arise. It is uncontradicted that the magistrate considered it nothing unusual to be asked to exercise judicial functions while attending a charity event in the evening. ("The officers sometimes chase me down according to where I am.") This practice appears to be necessary because somehow the various jurisdictions concerned have been unable to come up with a system under which police officers needing search warrants at odd hours can find a magistrate doing business at a more orthodox location than a brewery. We submit that in a county inhabited by several hundred judges who can exercise the powers of a magistrate (Pen. Code, § 808) such a state of affairs is intolerable. We are not unmindful of the recent amendments to sections 1526, 1528 and 1534 of the Penal Code, which appear to visualize the issuance of search warrants by telephone. This only changes the form of the problem, not its substance.

[9]Section 412 of the Evidence Code: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."

showing that it is not customary to attempt to take fingerprints in narcotics investigations.

Furthermore, in a case where, as here, defendants do not testify, a *sua sponte* instruction based on section 412 of the Evidence Code is almost certain to result in a reversal. (Cf. *People* v. *Romero,* 244 Cal.App.2d 495, 504-505 [53 Cal.Rptr. 260].)

## VII.

Both defendants claim that the evidence was insufficient to support their convictions. As is so frequently the case, their argument is addressed to the wrong court. No point would be served by a detailed recital of the evidence which amply justifies the jury's verdicts. Suffice it to say that the contraband in question was discovered in the master bedroom and in the garage of the Osborne residence. It was adequately established that the residence was occupied by defendants. When Officer Moore appeared there in the afternoon of March 20, 1970, Coleman fled and was not seen again for several days. The defense effort at the trial was, in the main, to show that the residence was visited by so many persons, that the connection between defendants and the contraband became too tenuous to support a conviction. It was for the jury to say whether that effort succeeded.

The judgments are affirmed.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied October 30, 1972, and the opinion was modified to read as printed above. Appellants' petitions for a hearing by the Supreme Court were denied November 29, 1972. Peters, J., was of the opinion that the petition should be granted.