Filed 12/18/14  P. v. Cross CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JERAD SCOTT CROSS,<br><br>    Defendant and Appellant. | 2d Crim. No. B253331<br>(Super. Ct. No. F482473)<br>(Los Angeles County) |

Jerad Scott Cross appeals from the judgment entered after a jury convicted him of second degree murder (Pen. Code, §§ 187(a), 189); gross vehicular manslaughter while intoxicated (*Id*., § 191.5(a)); driving with a suspended license (Veh. Code, § 14601.1(a)); and possession of a pipe used for smoking a controlled substance.  (Health & Saf. Code, § 11364.1.)   Appellant was sentenced to prison for 15 years to life.

The second degree murder conviction arose from a vehicular homicide and was based on an implied malice theory.  Appellant contends that the evidence is insufficient to support the jury's finding of implied malice.  He also contends that the trial court made several erroneous evidentiary rulings.  We affirm.

*Prosecution Evidence*

At about 9:00 a.m. on a sunny day in November 2012, a flagman stopped traffic on a highway in a construction area.  The flagman had a paddle with a stop sign on one side and "SLOW" on the other side.  Several warning signs on the highway gave advance

1

notice that road work was ahead and drivers should be prepared to stop. A tractor-trailer stopped and a Chevrolet pickup truck stopped behind it. A pickup truck driven by appellant did not stop. It did not even slow down. The flagman testified that appellant's truck "appeared to be going over the speed limit" of 55 miles per hour. In a vain effort to get appellant's attention, the flagman frantically waved his paddle back and forth. ~ Appellant's truck crashed into the rear of the Chevrolet. The force of the collision pushed the Chevrolet underneath the tractor-trailer. The driver of the Chevrolet died at the scene.

Appellant broke his ankle. While transporting him to a hospital, paramedics found a glass pipe in his possession. Residue in the pipe tested positive for methamphetamine. At the hospital, appellant told a police officer that he had used the pipe to smoke methamphetamine. Appellant also said that between 4:00 and 5:00 that morning he had taken "oxycontin for pain management and Xanax for anxiety." Based on appellant's physical symptoms, the officer formed the opinion that he "was under the combined influence of a central nervous stimulant and a narcotic analgesic." The stimulant was methamphetamine. The narcotic analgesic was oxycontin. Appellant told a nurse that he was taking Xanax, marijuana, methamphetamine, and oxycodone.

The parties stipulated that appellant's urine sample had tested "positive for opiates [oxycodone], benzodiazepines [Xanax], methamphetamine, and marijuana." They further stipulated that appellant's blood sample had tested negative for alcohol.

A toxicologist testified that Xanax is an "antianxiety medication" and a "quite powerful" sleep aid. The Xanax level in appellant's blood was high - .22 milligrams per liter. The toxicologist opined that this Xanax level alone would make it unsafe to drive. One would have to take at least 20 milligrams of Xanax to reach this level unless one were using it in an unconventional way, "such as melting it down, shooting it up or snorting it after they've crushed the pills." Doctors typically start patients at a dose of .5 milligrams "and then gradually raise them up, but . . . it's recommended not to exceed ten milligrams in one day." If one were taking six milligrams per day, one's "steady state level" would be .06 milligrams per liter.

2

Appellant had a prescription for Xanax directing him to take a single two-milligram tablet by mouth three times a day - a total of six milligrams per day. If he had followed the prescription, he should have had a steady state level of .06 milligrams per liter. His actual level of .22 milligrams per liter was more than three times this amount.

The toxicologist opined that the level of oxycodone was "slightly over what you would expect for someone taking it therapeutically" and "would have a combined central nervous system depressant [e]ffect with the [Xanax]." "[T]hen you throw in the methamphetamine, which on face value would have a tendency to offset some of the depressant effects of these two other drugs. However, what that does at a cellular level is causes confusion in the body and an individual is less attentive to their actions . . . ."

In May 2008, more than four years before the collision, appellant was arrested for driving under the influence of drugs. Appellant told the arresting officer that he had "crushed up a Xanax and snorted it." The parties stipulated that after his arrest appellant's urine sample had tested "positive for amphetamines, benzodiazepines, cocaine and opiates." In August 2008 appellant's driver's license was suspended for failure to appear in court on the charge of driving under the influence of drugs. The suspension was still in effect when the collision occurred in November 2012.

*Defense Evidence*

Appellant testified as follows: His friend, Devin Graham, was originally driving the truck that collided with the Chevrolet. The truck belonged to Graham's employer. Appellant "wasn't planning on driving."

Graham was falling asleep, so he asked appellant to drive. Appellant "was hesitant" to do so. He was tired and knew that his driver's license had been suspended. But appellant decided that it was better if he drove than if Graham drove. Appellant "felt fine when [he] got behind the wheel," but after about 30 minutes he started to feel tired. He "dozed off a couple times." He was "falling asleep, waking up, falling asleep, waking up." Appellant did not pull over and rest because Graham "was running late."

3

The last time appellant looked at the speedometer, the truck was traveling at 50 to 55 miles per hour. When the collision occurred, he was asleep. He therefore did not apply the brakes or take evasive action to avoid the collision.

That morning appellant took oxycodone and Xanax. He "snorted" the Xanax because it "works faster" when he snorts it than we he takes it by mouth. Appellant knew that these drugs made him sleepy. He also knew that, if he drove after taking these drugs, "it could be dangerous." But he "didn't ever know [he] could kill somebody." In addition, appellant knew that he "shouldn't take those drugs and then drive because [he was] arrested for doing that in 2008." Appellant admitted that, because of the drugs, he had fallen asleep at the wheel before the collision.

The previous evening, appellant smoked methamphetamine but did not smoke marijuana. He smoked marijuana "three or four, five days a week." He did not smoke marijuana or methamphetamine during the morning before the collision.

*Prosecution of Vehicular Homicide as Second Degree Murder*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).) "[M]alice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. [Citations.]" (*People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*).) In *Watson* our Supreme Court "created [a] theory for prosecuting vehicular homicide as second degree murder in cases involving implied malice. [Citation.]" (*People v. Doyle* (2013) 220 Cal.App.4th 1251, 1266, fn. 4.) The *Watson* court reasoned: "[A] finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i. e., a *subjective* standard. [Citation.]" (*Watson*, *supra*, 30 Cal.3d at pp. 296-297.) Accordingly, when the driver's conduct in a vehicular homicide case "can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied. [Citation.] In such cases, a murder charge is appropriate." (*Id*., at p. 298.) "Wanton" has been defined as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." (Black's Law Dict. (9th ed. 2009) pp. 1719-1720.)

4

*Sufficiency of the Evidence*

Appellant contends that the evidence is insufficient to "support a finding that [he] had the implied malice necessary for a murder conviction." Appellant asserts: "There must be proof that the driver *actually appreciated* but consciously ignored the life-threatening risks of his or her conduct. Such proof was missing in this case."

" 'The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] . . . A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Viewing the evidence in the light most favorable to the prosecution, we conclude that substantial evidence supports the jury's finding of implied malice. Appellant drove despite knowing that he was tired and that his license had been suspended. That morning he had snorted Xanax instead of taking it by mouth as prescribed. His Xanax level was more than three times greater than what it would have been had he taken the prescribed dose by mouth. Appellant knew that Xanax and oxycodone, which he had also ingested that morning, made him sleepy. He was aware that, if he drove after taking these drugs, "it could be dangerous." Although appellant denied smoking methamphetamine that morning, it is reasonable to infer that he smoked it. Appellant tested positive for methamphetamine, and he carried a pipe for smoking it. Appellant was aware that he "shouldn't take those drugs and then drive because [he was] arrested for doing that in 2008." While driving he kept "falling asleep, waking up, falling asleep, waking up." Despite repeatedly dozing off at the wheel, he decided not to pull over and rest because his friend, Graham, "was running late." Based on these facts, a reasonable trier of fact could conclude beyond a reasonable doubt that appellant "*actually appreciated* the risk

5

involved" and acted with "a wanton disregard for life . . . ." (*People v. Watson*, *supra*, 30 Cal.3d at pp. 297, 298.)

The above facts belie appellant's claim that "[t]here are no facts in this case which would differentiate [his] mental state from that of anyone else driving under the influence of drugs for the purpose of whether he had sufficient malice for murder." We disagree with appellant that, "if this record supports a finding of implied malice, then every alcohol or drug-related vehicular manslaughter case would be a murder case."

*Evidentiary Rulings*

I

Appellant argues that the trial court erroneously "admitted three kinds of evidence regarding [his] prior driving history: (1) evidence that appellant had received five speeding tickets; (2) evidence that he had been involved in three non-injury accidents; and (3) evidence that [in May 2008] he had been arrested on suspicion of driving under the influence of narcotics." "We review for an abuse of discretion the trial court's rulings on the admissibility of evidence. [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.)

The trial court did not abuse its discretion. Evidence that a defendant committed a prior act is admissible "when relevant to prove some fact (such as . . . knowledge . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) It is reasonable to infer that the five speeding tickets made appellant aware of his obligation to drive within the speed limit. Evidence was presented that appellant had been speeding at the time of the collision. The flagman testified that appellant "appeared to be going over the speed limit" of 55 miles per hour. Another witness, Daniel Villalobos, testified that about two miles before the site of the collision, appellant's truck travelled across double lane lines to pass Villalobos's truck. At that time, Villalobos was driving at 55 or 56 miles per hour in a construction zone. It is reasonable to infer that, regardless of who was at fault, the three prior traffic accidents made appellant aware of the dangers inherent in driving and the necessity of staying alert in order to avoid a collision. Finally, as appellant testified, his May 2008 arrest for driving while under the

6

influence of drugs made him aware that he "shouldn't take those drugs and then drive." That appellant had not been convicted of the offense did not diminish the relevance of the arrest.

## II

Appellant argues that, pursuant to Evidence Code section 352, the trial court erroneously refused to exclude evidence of his driving history because its "unduly prejudicial effect . . . 'clearly outweighed its probative value.' [Citation.]" Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." "We review a challenge to a trial court's choice to admit or exclude evidence under section 352 for abuse of discretion. [Citation.] We will reverse only if the court's ruling was 'arbitrary, whimsical or capricious as a matter of law. [Citation.]' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

The trial court did not abuse its discretion under Evidence Code section 352. The evidence of appellant's driving history was highly probative and "was [far] less inflammatory than the testimony about the charged offense[]." (*People v. Quang Minh Tran* (2011) 51 Cal.4th 1040, 1050.) "This circumstance decreased the potential for prejudice, because it was unlikely that the jury . . . convicted [appellant] on the strength of [the] testimony . . . regarding [appellant's driving history], or that the jury's passions were inflamed by [this testimony]." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

## III

Department of Motor Vehicles (DMV) records indicate that appellant was the driver "most at fault" in the three prior traffic accidents. Appellant maintains that the trial court erroneously admitted evidence of these "at fault" determinations. He contends that the determinations were based on inadmissible accident reports. (Veh. Code, § 20013 ["No such accident report shall be used as evidence in any trial, civil or criminal, arising out of an accident"].) Appellant also contends that the "at fault" determinations are "legal conclusion[s] that [are] not the proper subject for expert opinion."

7

We agree with the People that appellant's contentions are forfeited because in the trial court he failed to object on the grounds stated in his contentions. (Evid. Code, § 353, subd. (a) [judgment shall not be reversed for erroneous admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].) During a pretrial hearing on the People's in limine motion to admit evidence of appellant's driving history, defense counsel objected "that the D.M.V. document is wholly lacking in information concerning what my client did." At trial defense counsel made a "no foundation" objection to the admission of the evidence without specifying why the foundation was deficient. The latter objection was inadequate on its face: "[W]here the objection is lack of proper foundation, counsel must point out specifically in what respect the foundation is deficient. [Citations.]" (*People v. Moore* (1970) 13 Cal.App.3d 424, 434, fn. 8.)

Even if appellant's contentions were not forfeited and the trial court had erred, the error would not have resulted in a miscarriage of justice. (Evid. Code, § 353, subd. (b).) It is not "reasonably probable that a result more favorable to [appellant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The People aptly note: "[A]s the defense conceded that appellant was at fault in the fatal traffic collision, it is inconceivable that he could have been prejudiced by evidence of the prior 'at fault' determinations."

*Disposition*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

8

Jacquelyn Duffy, Judge

Superior Court County of San Luis Obispo

_____

Susan B. Lascher, under appointment by the Court of Appeal, for Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.