Filed 9/27/13  Nadaf-Rahrov v. Neiman Marcus Group CA1/5
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **FOROUGH NADAF-RAHROV,** **Plaintiff, Respondent and Cross-Appellant,** v. **NEIMAN MARCUS GROUP, INC.,** **Defendant, Appellant and Cross-Respondent.** | **A132558 & A134723** **(San Francisco County Super. Ct. No. CGC-05-437680)** |

Forough Nadaf-Rahrov (Nadaf) obtained a jury verdict against her former employer, Neiman Marcus Group, Inc. (Neiman Marcus), on disability discrimination claims based on the failure to provide reasonable accommodations or engage in the interactive process.  Neiman Marcus appeals, arguing the judgment must be reversed based on the lack of admissible evidence Nadaf was able to perform the essential job duties of a position that was open during the relevant period.  We affirm the judgment, along with the court's award of attorney fees to Nadaf under the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940 et seq.).[1]  We reject Nadaf's claims on cross-appeal that she was entitled to judgment in her favor on an additional theory of disparate treatment disability discrimination, and that the court erred in granting nonsuit on her claim for punitive damages.

---

[1]  Further statutory references are to the Government Code unless otherwise indicated.

FACTS AND PROCEDURAL HISTORY

Nadaf began working as a clothes fitter for Neiman Marcus in Dallas in 1985, and transferred to the San Francisco store in the mid-1990s. She was considered a good employee. Before she began working for Neiman Marcus, Nadaf had owned a macramé gallery in Tehran, worked as an ordering clerk for Westinghouse/Iran Electronic Industry, helped operate a beauty salon in Italy, supervised employees of a Texas company in needlework finishing, and owned her own clothing boutique in Texas, for which she manufactured clothes.

Nadaf's duties as a fitter in the San Francisco store included hand sewing knit items and making alterations on women's gowns. She was required to bend and stoop as part of her job and spent a great deal of time on her knees. In November 2003, she sought treatment from Dr. Joel Klompus for pain in her joints and hands. Dr. Klompus diagnosed Nadaf as suffering from arthritis and polymyalgia rheumatica, an inflammatory arthritis affecting multiple joints including the knees, hips and shoulders.

Neiman Marcus placed Nadaf on leave under the Family and Medical Leave Act (FMLA), based on Dr. Klompus's certification she was "incapacitated" and "unable to perform work of any kind" through January 10, 2004. Dr. Klompus wrote additional notes extending this leave through March 5, 2004, indicating Nadaf was "unable to return to work."

While she was out on leave, Nadaf spoke to the human resources department about the possibility of finding another position at the store. On January 21, 2004, Nadaf wrote the following letter to Kelly Butler, the human resources manager at the San Francisco store: "I have almost twenty years of experiences working with Neiman Marcus in alteration department. I am deeply devoted to my job and I wish to continue working for many years ahead for the Neiman Marcus. . . . [¶] In recent months due to the excessive arthritis problems I am not able to perform my regular job at alteration department. Due to this arthritis problem and excessive pain I am not capable to use my fingers and knees that very much rela[te] to my job applications. To improve and cure the arthritic problem I am under doctor and specialist treatment. So under my current condition I am not able

2

to continuously use my fingers and knees. If it is necessary I will ask my doctor to write and explain about my circumstances. [¶] To help my present situation I am very much interested and willing to work at different Neiman Marcus department. Therefore, I would like to ask you another position and opportunity to continue my job at Neiman Marcus. I would very much appreciate your support and consideration and I look forward to hearing from you."

At Nadaf's request, Dr. Klompus wrote a letter to Butler on January 25, 2004: "I am writing at the request of my above-named patient who has been under my medical care for 10 years. She has suffered from arthritic pains for many years but these have worsened recently and specifically she has had increased pain and numbness in her hands, pain and tenderness in her knees, and pain in her feet. Evaluation by me as well as by a number of specialists have confirmed carpal tunnel syndrome as well as osteoarthritis of the back and polymyalgia rheumatica affecting multiple joints. I had previously treated Mrs. Nadaf with a number of medications which were of only moderate help and had periodically advised she take some time off work including from 10 November 2003 to the present. [¶] Most recently, I had prescribed steroid or cortisone-type medication which has brought about considerable improvement in some of the severe pains but has not relieved her back pain and knee pain. She still has symptoms of carpal tunnel syndrome in her hands and I believe she will require surgery to repair this. [¶] She has indicated to me a strong desire to continue working at Neiman Marcus but I have felt she is not able to work in the department she has been in for so many years because of her arthritic disease. I would strongly support her change to a position that would not involve bending, standing, or kneeling."

On February 16, 2004, Butler wrote Nadaf a letter that included the following information: "Your FMLA approved leave is exhausted as of February 1, 2004. Your latest doctor's note indicates that you are unable to return to work prior to March 5, 2004. We are no longer able to hold your position open. Business needs dictate that we must make some staffing changes. You agreed to contact me when you are released to return to work so that we can assist you in exploring other opportunities within the store.

3

[¶] Our records indicate that you have 402.02 hours of sick pay benefit remaining. Please forward any updated medical information to my attention. With proper medical updates, your sick pay benefits will continue unchanged until you are able to return to work, or your sick benefit hours are exhausted. If your situation changes and you are able to return to work prior to March 5, 2004, please get in touch with me so we can plan for your return."

Nadaf responded with a letter to Butler acknowledging Neiman Marcus needed to fill her position in the alteration department and indicating she would contact Butler when her doctor gave her a date for a release to return to work. On March 1, 2004, Dr. Klompus wrote another note indicating Nadaf needed to remain on disability leave at least until May 5, 2004. On May 10, 2004, he extended the return date to June 28, 2004, and on June 28, 2004, he extended this date to August 16, 2004. On July 14, 2004, Butler wrote Nadaf a letter indicating she was terminated as of that date, having exhausted her FMLA leave and sick leave.

Nadaf filed a complaint against Neiman Marcus alleging eight causes of action: (1) disability discrimination in violation of FEHA; (2) wrongful termination in violation of public policy based on disability discrimination; (3) retaliatory discrimination based on requests for reasonable accommodation under FEHA; (4) violation of Labor Code section 132a [prohibiting discrimination or retaliation for filing worker's compensation claim]; (5) wrongful termination in violation of public policy based on Labor Code section 132a; (6) discrimination based on national origin and ethnicity in violation of FEHA; (7) wrongful termination in violation of public policy based on national origin and ethnicity; and (8) age discrimination in violation of FEHA. The disability discrimination claim under FEHA was based on the failure to provide reasonable accommodation under section 12940, subdivision (m), and the failure to engage in the required good faith interactive process under section 12940, subdivision (n). Kelly Butler was also named as a defendant.

The trial court granted summary judgment in favor of Neiman Marcus and Butler. On appeal, this court concluded summary adjudication was appropriate for the claims

4

based on Labor Code section 132a and age discrimination, and all the claims against Kelly Butler as an individual defendant. The order granting summary judgment was reversed and remanded as to the remaining causes of actions, for which there were triable issues of fact. (See *Nadaf-Rahrov v. Neiman Marcus* (2008) 166 Cal.App.4th 952, 993 (*Nadaf-Rahrov*).)

The case was called for a jury trial. Nadaf voluntarily dismissed the causes of action for discrimination and wrongful termination based on national origin and ethnicity, leaving only the claims predicated on disability discrimination.

During trial, Nadaf testified that while she was no longer able to perform the ordinary duties of her job as a fitter in the women's clothing department, she would have been able to perform other jobs at Neiman Marcus that did not require her to spend so much time on her knees. While out on leave, she painted pictures, sewed, crocheted, knitted, babysat, cooked, and exercised. Nadaf called the human resources department several times during her leave seeking information about other positions, and usually spoke to Kayko Humphrey, who worked in the department. She spoke twice to Kelly Butler, who told her she needed a release from her doctor before they could discuss available positions, even though Nadaf explained she needed a description of other available jobs so Dr. Klompus would know what she would have to do. No one at Neiman Marcus discussed how she should go about returning to work with a disability or what accommodations could be given. Examples of positions Nadaf believed she could have performed even with her physical limitations were sales associate, makeup artist and customer service. Nadaf also knew from experience that other positions in the Alterations department (such as fitting men's clothing) would not have affected her knees.

Dr. Klompus testified that while his notes to Neiman Marcus described Nadaf as "unable to work," he was referring specifically to work in the fitter position she had held. He believed she could not return to work as a fitter due to the physical stresses it entailed, particularly to her knees, but she could have performed other jobs—which is why he wrote a letter in January 2004 saying he supported her request to move to another

5

position.  Nadaf's pain could be managed by appropriate medication and therapy, and he would have released her to any of the following jobs: answering phones, acting as a restaurant hostess, sales associate (with periodic breaks), makeup artist (with breaks to allow her to sit occasionally while working), visual trimmer (dressing mannequins and doing window displays).  Dr. Klompus believed Nadaf could sew using a machine, and could have worked as a seamstress if she could have sat at a machine and sewed.  She might also have been able to work with a clothes pressing machine, depending on the weight involved.  Dr. Klompus was never contacted by Neiman Marcus to clarify the extent of Nadaf's physical limitations.

Kelly Butler, who made the decision to terminate Nadaf, testified she understood Dr. Klompus's notes to mean Nadaf was physically unfit to perform work of any kind, not merely her job as a fitter.  She did not believe it was productive to discuss other possible positions until Nadaf had been released to return to work and her physical condition and possible restrictions were known.  Butler advised Nadaf Neiman Marcus would need a release from Nadaf's doctor before she could return to work, and told her that after she received a release, they would discuss other positions.

Nina Kern, who worked for Neiman Marcus in Texas as its Vice President of Associate Relations, was generally responsible for employee relations and served as an internal consultant to the various stores' human resource managers.  She testified there were no written procedures for terminating disabled employees.  Neiman Marcus did not provide uniform training for its human resource personnel regarding the termination of disabled employees, though the human resource people obtained information from seminars and conference calls with in-house counsel.  When a disabled employee wished to return to work, human resource personnel would engage in an interactive process consisting of conversations with the employee.  Neiman Marcus had to understand the scope of an employee's restrictions, but there was no policy conditioning a discussion of other jobs upon a release to return to work.  The Neiman Marcus employee handbook included equal opportunity employment policies, and human resource associates were required to comply with all laws regarding a disabled employee's return to work.  Kern

was not consulted by the San Francisco store about Nadaf's termination and did not learn about it until after the fact.

The trial court granted Neiman Marcus's motion for nonsuit on Nadaf's claim for punitive damages. The jurors received verdict forms presenting theories of disability discrimination based on disparate treatment (§ 12940, subd. (a)), failure to make reasonable accommodation (§ 12940, subd. (m)), and failure to engage in the interactive process (§ 12940, subd. (n)), as well as wrongful discharge in violation of public policy based on disability discrimination. They found in favor of Neiman Marcus on the disparate treatment theory, but found in favor of Nadaf on the theories of failure to provide reasonable accommodation, failure to engage in the interactive process, and wrongful discharge in violation of public policy. Nadaf was awarded $128,230 in economic and non-economic damages, reflecting $231,000 in past lost earnings, $64,680 in past lost benefits, $33,000 in past emotional distress, and $3,220 in lost interest on past lost earnings and benefits, less $203,670 for what Nadaf could have earned by returning to gainful employment. The court denied Neiman Marcus's motion for judgment notwithstanding the verdict, which was based on an alleged lack of admissible evidence of open positions at Neiman Marcus that Nadaf was qualified to perform. In a post-trial motion, the court awarded Nadaf's attorneys $1,283,629.18 in fees under FEHA.

Neiman Marcus appeals from the judgment, arguing there was no substantial evidence Nadaf was qualified to fill open positions at the store because the only evidence of open positions was inadmissible testimony by Butler that was not based on her personal knowledge of such positions. Nadaf filed a cross-appeal, in which she challenges the jury's verdict in favor of Neiman Marcus under the disparate treatment theory of disability discrimination and the court's order granting nonsuit on her request for punitive damages. Neiman Marcus separately appeals from the order awarding attorney fees, arguing the court abused its discretion in failing to apportion fees between the successful and unsuccessful causes of action and in applying a 1.1 multiplier in a "routine employment matter." We have ordered the appeals consolidated.

7

DISCUSSION

I. *Evidence of Open Positions at Neiman Marcus*

Section 12940, subdivision (m) declares it an unlawful employment practice for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." Subdivision (n) of the section 12940 declares it an unlawful practice for an employer "to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." When the accommodation sought is a job reassignment, the employer must make affirmative efforts to determine whether a vacant position is available for which the employee is qualified and must make the reassignment unless to do so would create a hardship for the employer. (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 766-767; *Spitzer v. Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1383.) The position must exist and be vacant, and the employer need not promote the disabled employee. (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at pp. 963, 979-984.)

The jury in this case determined Neiman Marcus had failed to accommodate Nadaf's disability or engage in the interactive process, in violation of section 12940, subdivisions (m) and (n), and had violated public policy in doing so. Neiman Marcus argues the judgment must be reversed because Nadaf failed to present any admissible, substantial evidence of vacant positions for which Nadaf was qualified during the relevant period. We disagree.[2]

The evidence of open positions was elicited through Kelly Butler, who had worked as the human resources manager for Neiman Marcus's San Francisco store, and

---

[2] Although the opening brief filed by Neiman Marcus sets forth the evidence in a manner suggesting Nadaf's disability and other circumstances would have precluded her from performing the positions at issue, it does not contain a challenge to the jury's conclusion she was qualified and able to perform at least one of those positions. The challenge to the sufficiency of the evidence is limited to the narrow issue of whether these positions were in fact open during the relevant time period.

who terminated Nadaf. Butler testified there were "a lot of available jobs at the Neiman Marcus store" between January 1, 2004 and July 14, 2004 (Nadaf's date of termination). During Butler's testimony, Nadaf's trial counsel showed her a computer-generated list of job positions filled at Neiman Marcus between January and June of 2004. Counsel for Neiman Marcus objected based on a lack of foundation, and additionally stated the list included positions the court had already determined were not relevant to the case at hand. During questioning by the court, Butler indicated she had not prepared the document, having seen it for the first time at her deposition, but she recognized it as containing the codes for the listed employees' pay groups, the employees' identification numbers, and their dates of hire. Butler testified that with a couple of exceptions, the listed positions were with the San Francisco store. The court then allowed Nadaf's counsel to proceed with questioning about the positions relevant to this case, with no objection by Neiman Marcus's counsel. Butler testified about a number of positions filled between January and July 2004, including makeup artists, food preparation/pantry, and sales associates, and explained she did not discuss these positions with Nadaf because she believed Nadaf was unable to return to work.

During additional questioning by plaintiff's counsel the following day, Butler was asked whether Neiman Marcus had filled tailor/tailoress positions during Nadaf's leave period. Counsel for Neiman Marcus objected based on a lack of foundation showing Butler had personal knowledge of these positions. When questioned by the court, Butler explained she tended to get involved in the higher level management positions, with her assistants typically focusing on the positions at issue. Asked by the court whether she had personal knowledge of the tailor/tailoress positions, Butler responded, "No, I don't. I'm just reading the document." Counsel for Neiman Marcus moved to strike Butler's testimony the previous day about other open positions, which the court denied due to the lack of an adequate objection at the time the testimony was elicited. The court excluded further testimony by Butler about positions not within her personal knowledge.

Nadaf's counsel later asked the court to admit the list of open positions into evidence. Neiman Marcus's counsel opposed that request and urged the court to strike all

9

of Butler's testimony regarding open positions, on the ground she lacked personal knowledge of any of those positions. The court ruled the list itself was inadmissible, because Nadaf's counsel had not laid the foundation necessary to establish it met the criteria for a business record (Evid. Code, § 1271), but it declined to strike Butler's testimony. The court reasoned that when Butler was first shown the list, Neiman Marcus's counsel had not timely objected to her testimony based on a lack of personal knowledge of the open positions. The court noted counsel was free to argue Butler's testimony should not be credited because it appeared she was only reading what was in front of her. During closing argument, Neiman Marcus's counsel urged the jury to disregard Butler's testimony about the open positions because it was apparent she did not have any personal knowledge of those positions.

Neiman Marcus argues the judgment must be reversed because Butler's testimony about open positions was inadmissible, and no other evidence of open positions was presented. We review the trial court's evidentiary rulings denying Neiman's Marcus's motion to strike Butler's testimony under the highly deferential abuse-of-discretion standard. (*Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1217-1218.) An abuse of discretion is established when " 'the trial court exceeded the bounds of reason, all of the circumstances before it being considered.' " (*Id*. at p. 1218.) We will reverse only upon "a showing of a clear case of abuse and a miscarriage of justice." (*Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, 986.)

The trial court did not abuse its discretion by allowing Butler's testimony to stand. Butler was shown a document she said she recognized as a list of open job positions at Neiman Marcus during the time of Nadaf's leave. As human resources manager, Butler would logically have personal knowledge of or access to information about such positions. She testified about a number of positions while referring to the computer generated list, but this did not necessarily mean she was merely reading from the document. She did acknowledge she was simply reading from the document when asked about the tailor/tailoress positions on the list, on the second day of her testimony, but the jury could have reasonably concluded Butler knew of and was competent to testify about

10

the positions she had previously discussed. The trial court did not abuse its discretion in refusing to strike the testimony.

Neiman Marcus complains the court denied its motion to strike based on the erroneous belief its counsel had not adequately objected to Butler's testimony about the open positions. Again, we find no abuse of discretion. Counsel for Neiman Marcus objected as follows when the list was presented to Butler: "Your Honor, I would object to the use of this document. I don't think there's a foundation laid yet, and it also includes . . . .[¶] . . . . [¶] It includes positions that are not at issue in this case. It's not limited to the positions that have been decided by the Court to be relevant in this case. There are some that are; there are some that aren't."

An evidentiary objection must be timely and specific to be effective. (Evid. Code, § 353; *People v. Rogers* (1978) 21 Cal.3d 542, 548.) " 'An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a "placeholder" objection stating general or incorrect grounds (e.g. "relevance") and revise the objection later in a motion to strike stating specific or different grounds.' " (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564, italics omitted.) To describe evidence as "lacking foundation" is simply another way of saying the preliminary facts necessary to establish its admissibility have not been proved. (See Evid. Code, §§ 400-405; *People v. Hinton* (2006) 37 Cal.4th 839, 890-891; 3 Witkin, Evidence (5th ed. 2012) Presentation at Trial, § 61, p. 111.) Thus, "where the objection is lack of proper foundation, counsel must point out specifically in what respect the foundation is deficient." (*People v. Moore* (1970) 13 Cal.App.3d 424, 434, fn. 8.)

On the first day of Butler's testimony, counsel for Neiman Marcus made a general foundational objection to the computer-generated list of open positions, but he did not object on the specific ground that Butler lacked personal knowledge of the open positions. (Evid. Code, § 702.) It was not until the second day of Butler's testimony, when she was asked about the tailor/tailoress position, that Neiman Marcus's counsel objected on the ground she lacked personal knowledge. Absent greater specificity, the

"foundation" to which counsel was referring on the first day of Butler's testimony could have meant any number of things, including the facts necessary to establish the admissibility of the document as nonhearsay or under an exception to the hearsay rule. It was not "made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion [was] sought," nor did it "afford the [party opponent] an opportunity to establish its admissibility." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1261.) Because Neiman Marcus forfeited its claim that Butler's testimony about the open positions was inadmissible, her testimony supplies substantial evidence of the "open positions" element necessary to uphold the judgment.[3] (Evid. Code, § 353; *People v. Bailey* (1991) 1 Cal.App.4th 459, 463-465.)

## II. *Verdict on Nadaf's Discrimination Claim*

In her cross-appeal, Nadaf contends she was entitled to a verdict in her favor on the theory of disparate treatment disability discrimination under section 12940, subdivision (a). We reject the claim.

Section 12940, subdivision (a), makes it an unlawful employment practice "[f]or an employer, because of the . . . physical disability . . . of any person, . . . to bar or to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." An employee is discharged "because of" her disability if the disability is a "substantial motivating factor" in the discharge. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.) The special verdict form indicates the jury found against Nadaf under this theory because it determined her disability was not a motivating reason for her discharge. Nadaf argues she was entitled to a verdict in her favor on this claim, because no substantial evidence supports this finding.

---

[3] In light of our resolution of this issue, we do not address Nadaf's claim the court should have allowed evidence of a computer generated list of employment positions offered during the testimony of Nina Kerns.

12

In asking whether substantial evidence supports the finding that Nadaf's disability was not a motivating reason for her termination, Nadaf poses the wrong question. "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . [¶] . . . . [W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) The evidence presented by Nadaf, though sufficient to support a claim of disability discrimination, falls short of *compelling* a verdict in her favor under a disparate treatment theory.

In any event, Nadaf cannot prevail on her claim because she makes no showing the verdict on the disparate treatment theory affected the overall judgment or the damages she was awarded. Prejudice cannot be presumed and we will not reverse absent an affirmative showing of a miscarriage of justice. (Cal. Const., art. VI, § 13; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) Nadaf prevailed on the theories of failure to accommodate and failure to engage in the interactive process, and was awarded damages for back pay, lost benefits and emotional distress. She does not explain how a favorable verdict on the disparate treatment theory would have resulted in a higher amount of damages. "Regardless of the nature or number of legal theories advanced by the plaintiff, [s]he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence . . . Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158-1159.)

### III. *Nonsuit on Punitive Damages Claim*

Nadaf argues the trial court erred by granting Neiman Marcus's motion for nonsuit on her claim for punitive damages. We disagree.

Civil Code section 3294, subdivision (a) authorizes the recovery of punitive damages in a tort action "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Under subdivision (c) of the section 3294, "(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

An employer's liability for punitive damages based on the actions of its employees is limited by Civil Code section 3294, subdivision (b): "An employer shall not be liable for [punitive damages] based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." The findings necessary to support employer liability under Civil Code section 3294, subdivision (b), like the findings of malice, oppression, or fraud under subdivision (a), are subject to proof under the elevated standard of clear and convincing evidence. (*Barton v. Alexander Hamilton Life Ins. Co. of America* (2003) 110 Cal.App.4th 1640, 1644 (*Barton*).)

14

Nonsuit is appropriate when there is no substantial evidence to support a verdict in favor of the plaintiff on the cause of action or claim at issue, including a claim for punitive damages. (*Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 481 (*Stewart*); *Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 60 (*Hoch*).) "[T]he court may not weigh the evidence or determine the credibility of witnesses. The evidence favorable to the plaintiff must be accepted as true and any conflicting evidence disregarded." (*Hoch,* at p. 58.) We apply the same standard when reviewing on appeal an order granting nonsuit. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215.)

For purposes of a nonsuit motion, "substantial evidence" is not synonymous with "any evidence," but refers to evidence that is reasonable, credible and of solid value. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 845.) Because a claim for punitive damages requires proof by clear and convincing evidence, a motion for nonsuit on such a claim must be evaluated in that light and "with that higher burden in mind." (*Stewart*, *supra*, 17 Cal.App.4th at p. 482.) A nonsuit may be granted on the issue of punitive damages "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." (*Hoch*, *supra*, 24 Cal.App.4th at pp. 60-61.) And, when the status of a corporate employee under Civil Code section 3294, subdivision (b) is at issue, nonsuit may be granted if no reasonable jury could find by clear and convincing evidence the employee was an officer, director, or managing agent. (See *Barton*, *supra*, 110 Cal.App.4th at p. 1644.)

The trial court properly granted a nonsuit on Nadaf's punitive damages claim. As a corporate employer, Neiman Marcus could only be liable for punitive damages if the acts supporting such an award were committed by "an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).) The two Neiman Marcus employees whose conduct was at issue were Nina Kern and Kelly Butler. Kern, a vice-president, was an "officer" of Neiman Marcus, but she worked in Texas, was not consulted about Nadaf's termination, and played no role in that process. Nadaf suggests she is culpable because she did not assure that the company's human resource managers

15

followed a uniform written policy when dealing with disabled employees who wished to return to work, but while the absence of such a policy may be debatable as a business practice, it does not come close to establishing malice, oppression, or fraud.

Butler, the human resource manager for the San Francisco store, indisputably was not a corporate officer or director, and her conduct could only support an award of punitive damages if substantial evidence was presented to show she acted as a "managing agent" of the company. The "mere ability to hire and fire employees" does not render a supervisory employee a managing agent under Civil Code section 3294. (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566 (*White*).) Instead, that term includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*Id*. at pp. 566-567; see also *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822-823.) Even the highest-ranking employee in one office of a corporation may not qualify as a managing agent when business policies are made at corporate headquarters. (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421-422.)

Viewed in the light most favorable to Nadaf, the evidence showed Butler had the authority to hire and fire employees of the Neiman Marcus store in San Francisco. But no showing was made Butler shaped corporate policy in any way. She was not even the highest ranking employee at the San Francisco store, rather, she reported to the store's general manager. Given the state of the record, no reasonable jury could have found clear and convincing evidence Butler was a managing agent of Neiman Marcus.

Even if we assume Butler's position amounted to a managing agent, substantial evidence did not support a finding she was guilty of malice, oppression, or fraud as is necessary to support an award of punitive damages. The jury concluded Butler did not provide reasonable accommodation for Nadaf or sufficiently engage in the interactive process, crediting testimony by Nadaf and Dr. Klompus that Nadaf could have filled some position during the relevant time frame. But this does not mean the notes from Dr. Klompus were without ambiguity as to Nadaf's physical condition or whether she could return to work of any kind. The evidence supports the jury's finding (by a

16

preponderance of the evidence) that Butler should have done more to try to locate a new position for Nadaf, but it would not support a finding by clear and convincing evidence that Butler's decision to adopt a "wait-and-see" approach was "despicable" as required by section 3294, subdivisions (a) and (b), i.e., "base," "vile" or "contemptible." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725-726.)

IV. *Attorney Fees*

Neiman Marcus argues the case must be remanded for a new calculation of attorney fees. We reject the claim.

Under FEHA, the trial court, in its discretion, may award to the prevailing party reasonable attorney fees and costs. (§ 12965, subd. (b).) Private lawsuits are often necessary to effectuate the public policies under FEHA, and " ' "without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." ' " (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 583.) The fees awarded may substantially exceed the damages awarded when rights under FEHA have been vindicated. (*Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 426-427 (*Harman II*); *Beaty v. BET Holdings, Inc.* (9th Cir. 2000) 222 F.3d 607, 612-613.)

In determining a fee award under FEHA, "the trial court must first determine 'a "lodestar" or "touchstone" figure, which is the product of the number of hours worked by the attorneys and a reasonable fee per hour.' [Citations.] The trial court then has the discretion to increase or reduce the lodestar figure by applying a positive or negative ' "multiplier" ' based on a variety of factors. [Citations.] We review the trial court's decision on attorney fees under an abuse of discretion standard. [Citation.]" (*Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418, 422 (*Greene*).)

Nadaf's trial counsel sought a total of $3,287,060 in fees, consisting of a $1,623,087 lodestar enhanced by a 2.0 multiplier. This figure included 1,683.2 hours billed by lead counsel at a $500 hourly rate and 647.6 hours billed at a $650 hourly rate by an appellate specialist who worked on matters including Nadaf's appeal from the order granting summary judgment. The trial court found the amount requested to be

17

"grossly inflated when considered in light of the claims on which Plaintiff succeeded, the amount of damages awarded and the amount of time an attorney might reasonably [be] expected to spend in litigating such a claim." It awarded $1,283,629.18 in fees, consisting of a lodestar of $1,166,935.62 and a multiplier of 1.1, and setting lead counsel's reasonable hourly fee at $400 rather than $500. The court's written order explains the 1.1 multiplier as appropriate "based on the fact that this was a contingent case and there was appellate litigation that resulted in a published opinion."

Neiman Marcus argues the trial court abused its discretion by failing to disallow hours that counsel expended on the causes of action on which Nadaf did not prevail—the theories of retaliation and discrimination based on age and national origin that were resolved on summary judgment or dismissed before trial. It relies primarily on *Hensley v. Eckerhart* (1983) 461 U.S. 424, 434 (*Hensley*), *Harman v. City and County of San Francisco* (2006) 136 Cal.App.4th 1279, 1316 (*Harman I*), and *Harman II*, *supra*, 158 Cal.App.4th at p. 417, under which a trial court considering a fee award must ask whether the plaintiff failed to prevail on claims that were unrelated to the claims on which she succeeded. (*Hensley*, *supra*, 461 U.S. at p. 434; *Harman II*, *supra*, 158 Cal.App.4th at p. 423.) If a claim is both unsuccessful and unrelated to a successful claim, it "cannot be deemed to have been 'expended in pursuit of the ultimate result achieved' " and cannot be a basis for a fee award. (*Hensley*, at p. 435.)

No bright-line test is available to determine whether claims are related or unrelated. "[T]he concept of a related '*Hensley*' claim embraces claims that involve a 'common core of facts *or* are based on related legal theories.' " (*Harman I*, *supra*, 136 Cal.App.4th at p. 1311.) " '[A] useful tool for making this determination is to focus on whether the claims seek relief for essentially the same course of conduct. Under this analysis, an unsuccessful claim will be *un*related to a successful claim when the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.' " (*Ibid.*; *Harman II*, *supra*, 158 Cal.App.4th at p. 423.) Absent an indication to the contrary, we presume an order awarding fees was correct and

18

the court considered all of the relevant factors.  (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 67; *Cruz v. Ayromloo* (2007) 155 Cal.App.4th 1270, 1274.)

The record does not support Neiman' Marcus's assertion the court failed to appropriately limit the fee award to the successful disability discrimination claims. Neiman Marcus argued for apportionment in its opposition to Nadaf's motion for attorney fees.  Counsel for Nadaf responded that the amount of time spent on the other claims was "very little" and the core facts underlying those claims was the same.  The trial court reduced the lodestar amount by almost $500,000, or about a third, because it determined a lower award to be reasonable "in light of the claims on which Plaintiff succeeded."  It therefore appears the court *did* take the unsuccessful claims into account when setting the lodestar.  Notably, the unsuccessful claims arose from the same set of operative facts as the disability discrimination claims on which Nadaf prevailed, even if the evidence necessary to prove each one would have differed to some degree.  Neiman Marcus has not established the court abused its discretion in failing to further reduce the award.  (See *Greene*, *supra*, 101 Cal.App.4th at pp. 422-423, 424 [no abuse of discretion where plaintiff was not successful on all claims and court reduced fees by 20 percent to reflect degree of success in the lawsuit].)

Neiman Marcus also complains the court should not have used a multiplier to increase the lodestar amount.  We disagree.  The lodestar may be enhanced by a multiplier based on factors such as " '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award.  [Citation.]'  [Citation.]" (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1216.)  The Supreme Court has described the purpose of the multiplier as "primarily to compensate the attorney for the prevailing party at a rate reflecting the risk of nonpayment in contingency cases as a class," since "market-level compensation for [attorney services under a contingency fee agreement] . . . typically includes a premium for the risk of nonpayment or delay in payment of attorney fees."

(*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1138.)  The trial court's decision to use a "modest" 1.1 multiplier to reflect the contingency fee and the complexity of the prior appeal (which presented issues substantial enough to result in a published decision) was well within its discretion.  (*Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379, 1399.)

## DISPOSITION

The judgment, including the order awarding attorney fees, is affirmed. Respondent shall recover attorney fees and costs on appeal in appeal Nos. A132558 and A134723.  The case is remanded to the trial court to determine the appropriate amount of attorney fees on appeal.

 

 

_____

NEEDHAM, J.

 

We concur.

 

_____

JONES, P. J.

 

_____

SIMONS, J.